IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

IN RE:                                    )
TIMOTHY A. HUNDLEY, and                   )
PATRICIA L. HUNDLEY,                      )
                                          )
          Debtors.                        )
_____  )
                                          )        Civ. No.  06-1038-WEB
COMMERCIAL BANK,                          )        (Bkrtcy. No. 05-13580-13)
                                          )
          Creditor/Appellant,             )
                                          )
v.                                        )
                                          )
TIMOTHY A. HUNDLEY, and                   )
PATRICIA L. HUNDLEY,                      )
                                          )
          Debtors/Appellees.              )
_____  )

## Memorandum and Order

Commercial Bank ("Bank") appeals an order of the Bankruptcy Court finding that the Bank

violated the automatic stay of 11 U.S.C. § 362.  The case involves a vehicle lawfully repossessed

by the Bank shortly before the debtors, Timothy and Patricia Hundley, filed Chapter 13 bankruptcy.

After the petition was filed, the debtors' counsel contacted the Bank and attempted to get the car

back.  When that failed, the debtors filed a motion for turnover of the property.  The parties tried to

resolve the matter but could not agree on payment of storage fees claimed by the Bank's

repossession agent.  At an expedited hearing, the Bankruptcy Court ordered the Bank to turnover

the car and it ordered the debtors to make certain payments.  After a subsequent evidentiary hearing,

the Court ruled that the Bank had willfully violated the automatic stay by retaining the vehicle after

receiving notice of the debtors' bankruptcy, and it awarded the debtors actual damages of $48.40

and attorney's fees of $2,257.50.  The Bank appeals, arguing it did not violate the stay or,

alternatively, that any violation was not willful.

Subject matter jurisdiction over the appeal is established by 28 U.S.C. § 158(a)(1).  Review of a bankruptcy court's factual findings is subject to a clearly erroneous standard, while review of its conclusions of law is *de novo*. Fed. R. Bankr.P. 8013; Fed.R.Civ.P. 52.

I. *Facts*.

Neither party specifically challenges the factual findings made by the Bankruptcy Court in its written order of February 7, 2006.  The following statement is taken primarily from that order.

The Bank lawfully repossessed the debtors' 1999 Chevrolet Blazer.  The Bank had a security interest in the vehicle based on a loan to the debtors, and the debtors had been in payment default for about three months.  The Bank hired Southwest Service Company ("Southwest") of Haysville, Kansas, to repossess the vehicle.  Southwest repossessed the car on June 2, 2005, and retained possession of it at a Southwest facility.  On June 8th or 9th, Southwest took the Blazer to Midwest Auto Auction to get it "detailed" (cleaned) in preparation for sale.  The vehicle was at the detail shop for two days.  On or about June 10, Southwest, acting at the Bank's direction, retrieved the vehicle and took it back to the Southwest facility.  The Bank directed Southwest to do so apparently because the Bank received some indication the debtors were filing bankruptcy.

Southwest's standard charge for an involuntary repossession includes a $330 repossession fee.  It also charges a daily storage fee of $8.95 to lien holders or, alternatively, a $15 daily fee to debtors for storage of a vehicle at its facility.

On June 10, 2005, the debtors filed their Chapter 13 petition.  On June 14, 2005, debtors' counsel, Mark Lazzo, faxed a copy of the Court's Notice of Bankruptcy Filing to the Bank's officer, Jack Freisberg, who was handling the debtors' loan.  The Bank thus had notice of the filing and the

attachment of the automatic stay as of June 14, 2005.

On June 17, 2005, the debtors filed a motion for an order directing the Bank to immediately turnover the vehicle.  The motion alleged that the debtors would submit a plan proposing to pay the Bank in full its allowed secured claim on the vehicle, and that they needed the vehicle to successfully complete the plan because it was used as transportation to and from work.  The motion also alleged that the debtors had full insurance coverage on the vehicle.  Doc. 2, Exh. 2.  The debtors requested an expedited hearing on the motion.

The Bank retained the law firm of Klenda, Mitchell to represent it on the matter.  On June 21, 2005, Mr. Lazzo conferred with J. Michael Morris of the Klenda, Mitchell firm, who advised him the Bank would release the vehicle and that the details could be worked out with Mr. Morris' associate, Sarah L. Newell.

In subsequent discussions between Mr. Lazzo and Ms. Newell, the parties could not agree on what the debtors would pay to obtain return of their vehicle.  Based upon prior practice and custom in this District, the debtors agreed to pay the repossession fee and advised the Bank that the vehicle was insured for six months.  The negotiations broke down, however, when the debtors refused to pay the storage fees.

At a June 29 expedited hearing on the debtors' motion, the Bankruptcy Court ordered that the vehicle be turned over to the debtors, and it ordered the debtors to pay the repossession fee and to timely make the payments called for in their Chapter 13 plan.  The Court also found the debtors were responsible to pay the storage fees incurred from the date of repossession up to the date of the bankruptcy filing (June 10th).  Because there was an apparent dispute about when the Bank first received notice of the bankruptcy, the Court scheduled an evidentiary hearing on that issue for

September of 2005, and said it would also address at that time responsibility for any remaining fees and the debtors' request for sanctions.  Following the June 29 hearing, the debtors went to the Southwest facility to retrieve the Blazer.  They paid $120 cash to Southwest for storage fees (8 days @ $15 per day) to obtain the vehicle.  The debtors also paid the $330 repossession fee.

The Bankruptcy Court held an evidentiary hearing on September 27, 2005, to address the remaining issues.  The Court heard testimony from Ms. Hundley, Bruce Mellecker of Southwest Service Company, and J. Michael Morris.  It also accepted testimonial proffers from Mr. Lazzo and Ms. Newell.  The Court took the matter under advisement at the conclusion of the hearing, and it subsequently issued a written opinion finding that the Bank violated the automatic stay.

II. _Summary of Bankruptcy Court Ruling_.

In its written order, the Bankruptcy Court relied upon _In re Yates_, 332 B.R. 1, 7 (10th Cir. BAP 2005) for the proposition that "retaining repossessed property is just the kind of continuing action that the stay prohibits."  Doc. 2, Exh. 17, at 6.  The Court said there was "no real dispute in the record that the Bank, through its agent Southwest, held onto the vehicle well after learning of debtors' bankruptcy filing in an apparent attempt to extract payment of the storage charges from debtors."  _Id_.  The Court rejected the Bank's argument that it was not required to ask for release of the collateral from Southwest by virtue of § 363(b)(3), an exception which provides that in certain circumstances the stay does not prevent acts "to maintain or continue the perfection [] of an interest in property."  The Bank had argued that Southwest had a garagemen's lien and was therefore entitled to continued possession of the car to maintain perfection of its lien.  The Court recognized that the Bank was entitled to direct Southwest to repossess and store the vehicle, and that when Southwest did so "it obtained a lien for storage charges which would have to be satisfied from the proceeds

upon disposition of the vehicle or to secure release of the vehicle back to [the] debtors." *Id*. at p.8. But it said that the Bank's right to collect these expenses from the debtors was a part of the Bank's rights under Article Nine rather than a function of Southwest's statutory lien, and that the Bank's right to payment for that debt would become a part of the Bank's claim in the bankruptcy. *Id*. Moreover, the Court found significant that the debtors did not charge Southwest with violating the stay, but rather their action was "directed at the Bank who, as principal, directed its agent, Southwest's actions." *Id*. This was important because "[t]he perfection of the Bank's prepetition security interest in no way depended on possession of the vehicle." *Id*. The Bankruptcy Court said this factor distinguished two Ninth Circuit BAP decisions, *In re Boggan*, 251 B.R. 95 (9th Cir. BAP 2000) and *In re Hayden*, 308 B.R. 428 (9th Cir. BAP 2004), both of which dealt "with creditors holding valid statutory possessory liens against the collateral...." Doc. 2, Exh. 17, at p.8. "Were [the] debtors seeking sanctions against Southwest for retaining the Blazer," the Court said, "these cases would be relevant and persuasive." *Id*. at 8-9. But the debtors were proceeding against the Bank, and the Bank's lien was perfected under the vehicle titling statute and had "nothing whatever to do with possession of the Blazer...." *Id*.

The Court found that "the Bank's dogged retention of the Blazer in the face of notice of the debtors' bankruptcy petition and their counsel's request for its return falls squarely within the conduct proscribed by § 362(a)(3)." *Id*. at 10. It said that it when it ordered the car released in late June, "it fell to the Bank to instruct Southwest to proceed" and in fact "it fell to the Bank to do that as soon as Mr. Freisberg received Mr. Lazzo's fax notice of the bankruptcy filing." *Id*. The Court added:

> Because the Bank had to pay Southwest to effect release of the vehicle, the Court ordered the debtors to pay the storage bill from

5

> June 2 to June 10, the date of their filing. Once the debtors did so, the vehicle should have been released immediately. This Court concludes that the Bank did in fact willfully violate the stay by retaining the vehicle from the date it received notice of the filing until the date the Court ordered it released in spite of debtors' demands and without seeking stay relief or adequate protection from the Court.

*Id*. at 10-11.

In support of its finding that the violation was willful, the Court noted that willfulness in this context does not require a specific intent to violate the stay, but only proof that the creditor knew of the stay and that its actions were intentional. *Id*. at 11, n. 33. As for damages, the Court found the debtors should have been required to pay only $8.95 per day for storage rather than $15 per day "because it was the Bank's duty to release the vehicle." *Id*. at 12. This $6.05 difference, multiplied by 8 days, led the Court to find actual damages of $48.40. The Court further found, pursuant to § 362(k)(1), that the debtors were entitled to a reasonable attorney's fee in the amount of $2,257.50 because they had to go to court to secure return of the vehicle.

III. *Summary of Arguments on Appeal*.

A. <u>Bank's Arguments</u>. The Bank argues the Bankruptcy Court erred for several reasons. First, it argues the Court erred by finding that Southwest did not have a possessory lien for storage charges that could be collected from the debtors before the vehicle was required to be turned over. Doc. 16 at 5. The Bank contends Southwest had such a lien by virtue of K.S.A. § 8-1103(a), because it provided towing and storage services at the request of the Bank, which was an "owner" of the vehicle. *See* K.S.A. § 8-126(n) ("Owner" includes person entitled to possession under security agreement). It did not matter that the debtors did not consent to or have an agreement with Southwest, the Bank maintains, because the Bank had an ownership interest under Kansas law and could lawfully direct Southwest to repossess and store the vehicle. Likewise, the Bank argues,

6

Southwest was a bailee and had a storage lien on the vehicle pursuant to K.S.A. § 8-201 and K.S.A. § 58-208, and the Bankruptcy Court overlooked the fact that such possessory liens would have been forfeited had the Bank or Southwest simply turned over the vehicle to the debtors. The Bank argues that Southwest's lien was separate and apart from the Bank's security interest, that the debtors were required to satisfy the storage and repossession bill to obtain their vehicle, and that because they refused to do so there was no stay violation on the Bank's part.

The Bank notes that *In re Yates* is not binding precedent in this court. It also argues *Yates* is flawed because it failed to distinguish between "derivative" and "non-derivative" estate interests, as explained in *In re Barringer*, 244 B.R. 402 (Bankr. E.D. Mich. 1999). In *Barringer,* the court found the automatic stay did not require a lawfully repossessing creditor to turnover the debtor's vehicle. The court said in such situations "the right of possession does not automatically become part of the estate by virtue of § 541(a)(1)." *Id.* at 408. Section 541(a)(1) provides in part that all legal or equitable interests *of the debtor* in property as of the commencement of the case constitute property of the estate. When the creditor rather than the debtor has the right to possession at the time of filing, *Barringer* held, that right does not become property of the estate under § 541(a)(1). The court observed that any right by the trustee to possession is "non-derivative"– meaning it does not derive from the debtor, but rather must come from the creditor – and indicated that non-derivative interests such as this do not become estate property until the trustee takes some affirmative action to acquire them from the creditor, such as by exercising the trustee's avoidance powers. *Barringer* found that § 542(a), which requires anyone in possession of property that the trustee may use, sell or lease under § 363, or which the debtor may exempt under § 522, to deliver such property to the trustee, requires notice and an adversary hearing before it can operate to transfer

the right of possession from the creditor to the trustee.  To hold that it automatically does so would, according to *Barringer*, be constitutionally suspect and contrary to Congressional intent.  *Barringer* concluded that "the right [of the trustee to possession] must be judicially recognized in the form of a court order compelling turnover" before a repossessing creditor could be found in violation of the automatic stay.  Relying on *Barringer* and its progeny, the Bank argues it had no legal obligation to give up its possessory interest without a motion for turnover by the debtor and a hearing at which the Bank could assert its defenses.

The Bank also argues that the Bankruptcy Court's ruling is inconsistent.  In its order the Court stated:

> On that date [June 14, when the Bank received notice of the bankruptcy], the vehicle should have been released if the Bank had been provided with evidence of insurance and reimbursement of the repossession fee and storage charges from the date of repossession to the date of notice.  The debtors should not have had to wait beyond the time they provided insurance and tendered the fees and charges. Here, however, the debtors were precluded from possession for another fifteen days, or until the matter came on for hearing on June 29, 2005.

Doc. 2, Exh. 17, at 11.  The Bank argues that this ignores "the fact that the delay in turnover was due to the debtor's attorney."  Doc. 16 at 13.  It says the debtor's counsel refused to pay any of Southwest's storage charges and failed to provide proof of insurance until the June 29th hearing. Moreover, the Bank maintains, at the June 29th hearing the Court sustained the Bank's position in part as to the storage charges and the insurance.  As such, the Bank argues it is inconsistent to find the Bank solely responsible for violating the stay.

Finally, the Bank argues its actions did not amount to a willful violation.  It points out that the law on this issue was unsettled (with *In re Yates* not being decided until September of 2005,

after the debtor's car was returned) and the Bank says it had a good faith belief its action were in accord with the stay.  The Bank notes that several other circuits have considered a party's good faith in determining whether a violation is willful, and contends cases such as *Yates* – which find good faith irrelevant – are inconsistent with Supreme Court precedent.  Given the uncertainty in the law, the Bank argues it was an abuse of discretion to impose sanctions.

B.  Debtors' Arguments.  The Debtors, for their part, first argue the Bank is attempting to raise a new issue on appeal by arguing that the right of possession was not part of the bankruptcy estate.  Otherwise, the Debtors essentially argue that the Bankruptcy Court correctly determined that a repossessing creditor has an affirmative duty to comply with the stay by returning a debtor's vehicle once the creditor receives notice of the bankruptcy.  They point out that the *Yates* court said its ruling was in accordance with the "vast majority" of courts on this issue, and it argues there are sound reasons for following that decision.  Among other things, the debtors say, the ruling is faithful to the Supreme Court's decision in *United States v. Whiting Pools, Inc.*, 462 U.S. 198 (1983), it protects debtors from coercive creditors who attempt to impose exorbitant charges, and it allows creditors to protect themselves by seeking an order from the court for adequate protection.  Moreover, they point out that the Bank's proffered rule would deprive the debtors of their means of getting to work while they await a court ruling on the matter.

The debtors argue the Bankruptcy Court correctly found the stay violation was not excused by § 362(b)(3), because the motion for turnover was brought based on the Bank's refusal to turnover the car, not the towing company Southwest's refusal.  The debtors accuse the Bank of "trying to hide behind the unasserted lien rights of a storage company as justification for its refusal to turn over the vehicle," and they contend the Court properly rejected that argument.  Moreover, they say Judge

9

Nugent correctly pointed out that the Bank's lien rights in the vehicle were perfected without possession of the vehicle and the Bank's security interest included storage expenses incurred upon repossession.  Doc. 19 at 13.

The debtors also contend the Court correctly found the violation was willful.  They note the Court's ruling was in keeping with the frequently expressed view that a specific intent to violate the stay is not required and that a good faith belief by the creditor that its action does not violate the stay is not sufficient.  Moreover, the debtors argue the evidence shows the Bank's actions were not taken in good faith.  They contend the Bank attempted to use its leverage on the storage charges to exact more favorable treatment under the plan; that the Bank's counsel previously admitted the Bank did not doubt the existence of insurance coverage, but now asserts that a failure to prove such coverage justified the retention of the vehicle; and that the Bank's claimed reliance upon the storage lien of Southwest was a pretext to justify the Bank's stay violation.

IV.  *Discussion*.

A.  *Code Provisions*.

The instant appeal is based primarily on the interplay of the following bankruptcy code provisions.

Section 541(a), as it pertains to this case,  provides that the filing of a voluntary bankruptcy petition creates an estate "comprised of ... the following property, wherever located and by whomever held:  *** (1) "... all legal and equitable interests of the debtor in property as of the commencement of the case."

Section 362, the automatic stay, provides in part that the filing of such a petition operates as a stay of any act to obtain possession of property of the estate "or to exercise control over" property

of the estate. § 362(a)(3).

Section 362(d) provides that upon application of a party, and after notice and a hearing, the court shall grant relief from the stay (including by terminating, modifying or conditioning the stay) for cause, including the lack of adequate protection of the party's interest in property.

Section 542(a) provides in part that any entity in possession "of property that the trustee may use, sell, or lease under section 363 ... or that the debtor may exempt under section 522... shall deliver [such property] to the trustee...."  Section 363(c)(1) generally permits the debtor to use property of the estate in the ordinary course of the debtor's business.

Finally, Section 362(b) exempts certain acts from the scope of the automatic stay.  Among other things, it provides that the filing of the petition does not stay "any act to ... maintain or continue the perfection of an interest in property to the extent that the trustee's rights and powers are subject to such perfection under section 546(b)...."

B. *Application of §362(a)(3) and § 542(a) to Creditor Holding Repossessed Automobile*.

The parties have amply documented the split of authority regarding whether a vehicle lawfully repossessed before bankruptcy becomes part of the bankruptcy estate and whether it must be turned over to the trustee to comply with the automatic stay.  One school of thought is represented by *In re Barringer*, 244 B.R. 402 (E.D. Mich. 1999), which held that the creditor was not obligated to turn the vehicle over without a hearing and court order because the debtor's property interest did not include the right of possession, and the trustee therefore did not inherit that right under Section 541(a)(1).  Under this view, the trustee (or debtor) does not obtain a right of possession until a hearing is held and the court orders adequate protection and the turnover of the property.  A second line of cases, including *In re Yates*, concludes that debtor's interest is sufficient to bring the vehicle

11

within the "property of the estate" under Section 541(a)(1), and the continued retention of the vehicle after the bankruptcy filing constitutes the exercise of control over estate property in violation of Section 362(a)(3).  These cases find that the creditor has a duty under Section 542(a) to promptly deliver the property to the trustee, and that the burden is on the trustee to seek relief to avoid violating the stay.

The debtors contend the Bank is improperly raising a new issue on appeal by arguing that the stay was not violated because the right to possession was not a part of the bankruptcy estate.  But because the Bankruptcy Court's ruling was premised on *In re Yates* and its rejection of such a claim, the Bank is free to argue that the Bankruptcy Court's ruling on this point was in error.

After considering both lines of cases, the court finds that *In re Yates* represents the better view.  To some degree the issue comes down to an interpretation of *United States v. Whiting Pools, Inc.*, 462 U.S. 198 (1983), which both lines of cases rely upon.  A straightforward reading of *Whiting Pools* favors the view that § 542(a) obligates a creditor to promptly turnover repossessed property in which the debtor retains an interest and which the trustee can use under § 363, regardless of the fact that the creditor rather than the debtor had the right to possession when the case commenced. *Whiting Pools* dealt with an IRS tax lien against the debtor corporation.  The IRS lawfully seized various personal property of the debtor, including equipment and vehicles, based on its lien.  The debtor then filed for Chapter 11 bankruptcy, prompting the IRS to seek a declaration that the automatic stay did not apply to the IRS or that the stay should be lifted.  In addressing the case, the Supreme Court noted that the basic purpose of Chapter 11 was to allow a troubled enterprise to be restructured so it could operate successfully in the future, and a reorganization "would have small chance of success ... if property essential to running the business were excluded from the estate."

*Id*. at 203.  As a result, "all the debtor's property must be included in the reorganization estate." *Id.*

The Court made clear that this includes property in which a creditor has a secured interest:

> Although Congress might have safeguarded the interests of secured creditors outright by excluding from the estate any property subject to a secured interest, it chose instead to include such property in the estate and to provide secured creditors with "adequate protection" for their interests. § 363(e), quoted in n. 7, supra. At the secured creditor's insistence, the bankruptcy court must place such limits or conditions on the trustee's power to sell, use, or lease property as are necessary to protect the creditor. The creditor with a secured interest in property included in the estate *must look to this provision for protection, rather than to the nonbankruptcy remedy of possession*.

*Id*. at 203-04 [emphasis added].  The Court went on to say that the purposely broad scope of Section 541(a)(1) is intended to include in the estate any property made available by other provisions of the Code, several of which "bring into the estate property in which the debtor did not have a possessory interest at the time the bankruptcy proceedings commenced." *Id*. at 205.  One such provision, the Court said, is Section 542(a), which requires an entity holding property of the debtor that the trustee can use under § 363 to turn that property over to the trustee. *Id*.  "Given the broad scope of the reorganization estate, property of the debtor repossessed by a secured creditor falls within this rule, and therefore may be drawn into the estate.  While there are explicit limitations on the reach of § 542(a), *none requires that the debtor hold a possessory interest in the property at the commencement of the reorganization proceedings*." [emphasis added].  Section 542(a), then, modifies the procedural rights available to creditors to protect and satisfy their liens:

> In effect, § 542(a) grants to the estate a possessory interest in certain property of the debtor that was not held by the debtor at the commencement of reorganization proceedings.  The Bankruptcy Code provides secured creditors various rights, including the right to adequate protection, *and these rights replace the protection afforded by possession*.

*Id.* at 207 [emphasis added].   Based on this reasoning, the Court ultimately found that the "reorganization estate includes property of the debtor that has been seized by a creditor prior to the filing of a petition for reorganization."  *Id.* at 209.

     *Yates'* application of *Whiting Pools* appears to be the majority rule, although there is a fairly even split.  *See In re Yates*, 332 B.R. 1, 5, n.14 (citing cases, including *In re Knaus*, 889 F.2d 773 (8th Cir. 1989) and *In re Sharon*, 234 B.R. 676 (6th Cir. BAP 1999)).  *See also* 5 Norton Bankr. L. & Pract.2d, § 118:19 (Thompson/West 2007).  The *Yates* line also appears more faithful than *Barringer* to the Supreme Court's pronouncements in *Whiting Pools*.  Clearly, the debtor's lack of a right to possession in *Whiting Pools* was no obstacle to the Court's finding that the property was part of the debtor's estate under Section 541(a)(1), or to its finding that the creditor was obligated to turn over the property pursuant to Section 542(a).  And although it is true that *Whiting Pools* did not address whether Section 542(a) requires turnover absent a hearing and an order from the Bankruptcy Court,  the Court's description of Section 542(a) can be read to support that view.[1]  If the Court's statements are taken at face value, it does not matter that the debtor had no right of possession at commencement of the case because Section 542(a) "in effect grants to the estate a possessory interest," at least where the debtor has a sufficient legal or equitable interest to make the

---

[1] *Cf. In re Young*, 193 B.R. 620, 622 (Bkrtcy. D. D.C. 1996), noting that "[t]he relevant question not directly addressed by the Court in *Whiting Pools* is whether the secured creditor must immediately turn over the property, thus making § 542 self-executing, or may hold it until the question of adequate protection pursuant to § 363 is resolved."  *Young* said *Whiting Pools* cannot be read as holding anything more than that the bankruptcy court can invoke § 542(a) to order turnover of the property.  *Id.*  It based this finding on the fact that the order under review directed the IRS to turn the property over *on the condition that Whiting provide the IRS with adequate protection* for its interests, and on what it said was the Supreme Court's tacit approval of "the common procedure whereby the secured creditor would be permitted to retain the property until adequate protection was given by the creditor."  *Id.*

property part of the bankruptcy estate and the property is useful to the trustee. Insofar as a repossessing secured creditor may claim its interest is jeopardized by turnover, *Whiting Pools* suggests it must seek an order of adequate protection from the court rather than relying upon "the nonbankruptcy remedy of possession." These statements indicate the creditor's duty to turnover such property under § 542(a) is indeed "self-effectuating," because that section grants the trustee the right of possession, with the onus on the creditor to seek modification of the stay as necessary for its protection. By contrast, the *Barringer* line of cases goes to great lengths to qualify the statements in *Whiting Pools*. In fact, *Barringer* is premised on the assumption that the Supreme Court did not really mean what it said. *Cf. Barringer*, 244 B.R. at 406 ("But we are confident that the Court meant no such thing."). And although the *Barringer* line of cases provides a plausible alternative interpretation, these cases fail to adequately explain how allowing the creditor to hold the property is consistent with the purposes of the automatic stay and Chapter 13 relief. For example, in *In re Young*, 193 B.R. 620 (Bkrtcy. D. D.C. 1996), the court minimized any prospect of harm to the debtor from this situation, saying that the debtor could "simply file[] an adversary proceeding seeking turnover ... and prove[] that the creditor is being accorded adequate protection...." *Id*. at 628. But the converse is true as well; a creditor can simply file a motion for relief from the stay if its interest is jeopardized by turnover. *See In re Yates*, 332 B.R. at 7-8. And when the creditor retains a vehicle that was used by the debtor as transportation to work, the debtor may be under severe financial pressure until relief can be obtained.

The *Yates'* view, by contrast, is likely to further Chapter 13's fundamental purpose of encouraging the debtor to obtain a fresh start through rehabilitation rather than liquidation. *In re Thompson*, 984 F.2d 1227, 1232 (10th Cir. 1990). The Bankruptcy Court in the instant case

implicitly found the debtors needed the use of the vehicle to carry out their Chapter 13 plan, including their proposal to repay the Bank.  That aspect of the court's ruling is not challenged and is supported by evidence.  Notwithstanding their default, the debtors still retained equitable interests in the car.  It is undisputed that at the commencement of the case the debtors retained an equitable right to redeem the vehicle, and presumably they retained other equitable rights such as the right to any surplus upon disposition of the vehicle.  The debtors also retained legal title to the vehicle.  By contrast, the creditor had a right to possess the vehicle for purposes of disposition and satisfying its lien, but it was clearly prohibited from disposing of the vehicle by the automatic stay.   To construe § 541(a)(1) as excluding such property could undermine the rehabilitative purposes of Chapter 13. *Cf. Whiting Pools*, 462 U.S. 198, 204, n.8 (1983) (noting that Section 541(a)(1) "speaks in terms of the debtor's 'interests ... in property,' rather than property in which the debtor has an interest, *but this choice of language was not meant to limit the expansive scope of the section*.").  It would also undermine the purpose of the automatic stay and place the onus on the debtor to take action to obtain relief.  *Cf. In re Yates*, 332 B.R. at 5-6 (discussing effect of burden of proof allocation).  *See also* H.R. Rep. No. 595, 95th Cong., 1st. Sess. 340, *reprinted in* 1978 U.S. Code Cong. & Admin. News 5963, 6296-97 (the automatic stay "gives the debtor a breathing spell from his creditors.  It stops all collection efforts, harassment, and all foreclosure actions.  It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy.").

        As the debtors point out, they acted with relative speed here but it still took more than two weeks to reacquire the vehicle after their petition was filed.  As a result, the debtors were not given a breathing spell and a chance to organize their affairs; they were faced with increased pressure from

the absence of a vehicle they needed to get to and from work. At the same time, the Bank, whose security interest in the vehicle was perfected with or without possession, retained the car in an attempt to collect both pre- and post-petition storage charges, with additional storage charges apparently accumulating each day. Consistent with prior orders of the Bankruptcy Court relating to adequate protection, the debtors offered to pay the Bank's repossession fee and assured the Bank they had insurance coverage on the vehicle for six months. The debtors filed their Chapter 13 plan on June 21, 2006; it called for payment of $7,000 to the Bank, secured by a lien on the vehicle, to be paid in full at 6.5% interest, with any claim by the Bank in excess of that amount to be treated as a general unsecured claim.[2] Yet, the Bank refused to consent to the release of the vehicle within a reasonable period of time. *Cf. In re Belcher*, 189 B.R. 16 (Bkrtcy. S.D Fla. 1995) (creditor is entitled to reasonable time to comply with turnover obligation). If the Bank felt the debtors' offer did not amount to adequate protection, it could have sought relief from the automatic stay. *See* 11 U.S.C. § 362(d)-(f). It could even have sought *ex parte* relief if it was necessary to prevent irreparable harm to the creditor's interest before a hearing could be held. Given the availability of such procedures, which may be invoked by the creditor before turnover of the property, the court is not persuaded by the Bank's intimation that application of *In re Yates* might violate the Bank's Fifth Amendment right not to be deprived of property without due process of law.

Two additional points bear mentioning here. First, the Bank argues it was not obligated to turn the vehicle over until June 29th because that was the first time the debtors provided a certificate

---

[2] Evidence or statements by counsel in the Bankruptcy proceedings indicated the Bank was actually owed about $10,800 on the loan, meaning the Plan "crammed down" the loan by about $3,800. The interest rate paid by the debtors may have been crammed down as well. Doc. 2-25 at 48. The Bank did not object to the Plan.

of insurance.  The Bankruptcy Court essentially found the Bank had waived any such argument, finding "[t]he Bank's counsel conceded in her proffer of testimony that return of the vehicle was not held up by debtors' supplying the proof of insurance."  Doc. 2-17, at 4.  The Bankruptcy Court also observed during one hearing that the Bank had likely received a copy of the insurance declaration from the insurance company.  At any rate, the Bank's argument provides no grounds for reversal. Under the rule of *In re Yates.*  a debtor's failure to prove adequate insurance might justify a court in granting a creditor's motion for relief from the stay, but it would not relieve the creditor of its obligation to turn over the property unless the court were to grant such relief.[3]  Because the Bank did not seek relief, the debtors' alleged failure to produce a certificate of insurance did not relieve the creditor of its duty to turn over the vehicle.

Secondly, the Bankruptcy Court's ruling contains some apparent inconsistencies about when the stay violation occurred.  On page 10 of its order, the Bankruptcy Court said it had ordered the debtors to pay the storage bill from June 2 to June 10, and that "[o]nce the debtors did so, the vehicle should have been released immediately."  But the debtors did not pay any storage charges until June 29th, and the vehicle was promptly released when they did so.  Similarly, on page 11 of its order the Bankruptcy Court said the following after finding the Bank had received notice of the bankruptcy on June 14:

> On that date, the vehicle should have been released if the Bank had been provided with evidence of insurance and reimbursement of the repossession fee and storage charges from the date of repossession to

---

[3] Of course, the Bankruptcy Court can effectively require future debtors to provide proof of insurance and to pay repossession and pre-petition storage fees before turnover by granting creditor requests to modify the automatic stay.  One would expect rulings of this nature to lead to an understanding among the bankruptcy bar as to what sort of adequate protection payments are required and thereby eliminate the need for such motions and hearings.

> the date of notice. The debtors should not have had to wait beyond
> the time they provided insurance evidence and tendered the fees and
> charges. Here, however, the debtors were precluded from possession
> for another fifteen days, or until the matter came on for hearing on
> June 29, 2005.

This statement too seems to suggest that no stay violation occurred until after the debtors "tendered" storage charges. Again, it is undisputed that the debtors did not pay any storage charges until June 29, and their vehicle was promptly released when they did so. As the court understands the ruling, the above comments refer to the Bankruptcy Judge's view of what constitutes adequate protection for the creditor under such circumstances, as opposed to the point at which the Bank's retention of the vehicle violated the automatic stay. In other words, the Bankruptcy Court was indicating it would likely grant a creditor's motion for relief from the stay under these circumstances unless the debtor tendered the repossession fee, pre-petition storage charges, and provided proof of insurance. *Cf.* Doc. 2, Exh. 17 at 13 (""[T]his Court will nearly always grant turnover of a vehicle to a Chapter 13 debtor in circumstances like these.... If the creditor seeks adequate protection beyond that offered by the debtor, it should promptly bring its issues before the Court."). As such, the court concludes these comments do not affect the Bankruptcy Court's ultimate holding that the Bank violated the stay by refusing to turn over the car within a reasonable time after the filing of the petition.

In sum, based on the *In re Yates* line of cases, the Bankruptcy Court did not err in finding that the property of the estate under Section 541(a)(1) included the 1999 Blazer, and that the Bank's retention of the vehicle constituted an act to exercise control over the property of the estate within the meaning of Section 362(a)(3). Moreover, the court affirms the Bankruptcy Court's finding that the automatic stay and Section 542(a) required the Bank to turnover the vehicle to the debtors even without a hearing and an order from the court. *See In re Williams*, 316 B.R. 534, 542 (E.D. Ark.

2004) ("These Code provisions, coupled with the Eighth Circuit's determination in *Knaus* that a creditor has an affirmative duty to turn over estate property upon the filing of a bankruptcy petition, leave no room for a creditor to withhold turnover based on that creditor's perception of what constitutes adequate protection.").

    C.  *Effect of Southwest's Lien*.

    The primary issue raised by the Bank below was whether Southwest's asserted storage lien exempted the Bank from any duty to release the vehicle as long as the debtors refused to pay the storage charges. The Bank reiterates that position now, arguing it did not violate the stay because "the Bank and its agent did nothing more than 'maintain ... perfection' of Southwest's possessory lien for storage as allowed by § 362(b)(3)."

    As an initial matter, the Bank has failed to show the Bankruptcy Court erred by finding Southwest did not have a storage lien under K.S.A. § 58-201. That statute does not give rise to a lien absent a request or consent for services by the owner of the vehicle, and there was no such request here from the debtors, who were the lawful owners. *Hartford Ins. Co. v. Overland Body Tow, Inc.*, 11 Kan.App.2d 373, 374, 724 P.2d 687 (1986). Notably, the Bank cites no authority to show that a secured party can be considered an "owner" for purposes of this lien statute.

    On the other hand, the Bank would be considered an "owner" under K.S.A. § 8-1103(a), and that section thus gave rise to a lien in favor of Southwest for its storage charges. *See* K.S.A. § 8-126(n) (secured party in lawful possession is considered "owner" under Motor Vehicle Act). Moreover, Southwest would lose its lien by voluntarily releasing the vehicle. K.S.A. § 58-215. The Bankruptcy Court recognized as much, but found the Bank nevertheless violated the stay by retaining the vehicle without seeking stay relief or adequate protection from the court. According

to the Bankruptcy Court, Southwest's lien did not allow the Bank to refuse consent for the release of the vehicle.  This court agrees.  The Bank's security interest was perfected without possession of the car, so the Bank cannot claim continued possession was necessary to maintain perfection of its own lien.  And although Southwest had a possessory lien and conceivably could have refused to release the vehicle to protect that lien, the Bank itself had no such lien and could not withhold its consent.[4]  And as the Bankruptcy Court said, after the petition was filed "it fell to the Bank to instruct Southwest to proceed."  At a minimum, the Bank had a duty to inform Southwest that the Bank would consent to a release of the vehicle without payment of the storage charges.  The evidence presented in the Bankruptcy Court showed that Southwest was acting as the Bank's agent, and it might well have released the vehicle if the Bank had conveyed its consent.  The dispute never reached that point, however, because the Bank clearly refused to give consent to Southwest for release of the vehicle.  As a result, the Bankruptcy Court said, the debtors' motion "is rightly directed at the Bank who, as principal, directed its agent, Southwest's actions."  Doc. 2, Exh. 17 at 8.  Given the evidence, the Bankruptcy Court did not err by finding that the Bank violated the stay in refusing to consent to the release of the vehicle.

The Bank also objects to this ruling on the grounds that the Bank rather than the debtors will end up paying these storage charges.  The Bank says the charges are added as part of its unsecured

---

[4] As the Bankruptcy Court indicated, if Southwest had refused to release the vehicle despite consent from the Bank, and the debtors had sought sanctions against Southwest for violating the stay, then case law affirming the right of such a lienholder to maintain possession of the property "would be relevant and persuasive."  Doc. 2, Exh. 17 at 9-10.  *See In re Boggan*, 251 B.R. 95 (9th Cir. BAP 2000) (car dealership, as holder of mechanic's lien, was entitled to maintain possession of car) and *In re Hayden*, 308 B.R. 428 (9th Cir. BAP 2004) (towing operator did not violate stay by retaining vehicle to maintain its possessory lien).  But the claim here was that the Bank, not Southwest, violated the stay by refusing to give its consent for the release of the vehicle.

claim, and they point out that the debtors' plan does not call for any payments on unsecured claims. To the extent this argument constitutes an appeal to equity, the court finds it unpersuasive. The Bankruptcy Court in fact ordered the debtors to pay the pre-petition storage charges, which they did, together with the repossession fee. It is true that the Bank might end up paying the post-petition storage charges, but this does not constitute grounds for reversal of the judgment. Such a finding is consistent with the finding that it is the Bank's responsibility, absent relief from the court, to turn over the property once the petition has been filed.

D. *Sanctions for Willful Violation*.

Lastly, the Bank contends the Bankruptcy Court erred by finding that the violation was willful and by awarding attorney's fees to the debtors. The Bank essentially argues that it acted in a good faith belief that it was complying with the stay, pointing out that the law pertaining to the turnover issue was unsettled, with no controlling decisions in Kansas, the Tenth Circuit BAP, or the Tenth Circuit Court of Appeals to guide the parties. The Bank further claims it was error not to place some responsibility for attorney's fees on the debtors, because it says the debtors' attorney contributed to the delay, and because the Bankruptcy Court partially sustained the Bank's position regarding payment of storage charges.

Section 362(k)(1) provides in part that an individual injured "by any willful violation" of the automatic stay "shall recover actual damages, including costs and attorneys' fees...." The overwhelming number of courts to address the issue have concluded that "willful" in this context does not require proof of a specific intent to violate the automatic stay. *See In re Chestnut*, 422 F.3d 298 (5th Cir. 2005). All that is required is that the creditor knew of the automatic stay and that its actions which violated the stay were intentional. *Id*. at 302 (willful violation shown if the defendant

knew of the stay, the defendant's acts were intentional, and the defendant's acts violated the stay). *See also In re Diviney*, 225 B.R. 762 (10th Cir. BAP 1998). Thus, a creditor's good faith belief that it had a right to the property is not relevant in determining whether the act was willful. *In re Chestnut*, 422 F.3d at 302.

Under this standard, the evidence clearly supports the Bankruptcy Court's finding that the violation was willful. The Bank knew of the stay by June 14th, it thereafter intentionally refused to release the vehicle within a reasonable time, and its intentional actions constituted a violation of the stay. Although the evidence and the uncertain law in this area might well support a finding that the Bank had a good faith belief it was entitled to hold the vehicle, such a belief is not relevant to the standard in § 362(k)(1).[5] The willfulness standard in § 362(k)(1) is apparently designed to ensure compliance with the stay by encouraging creditors to seek relief from the court whenever they are on notice of even a potential stay violation. *See In re Ozenne*, 337 B.R. 214 (9th Cir. BAP 2006) (violation of stay was willful even though the law was unclear; appropriate course is for creditor to seek relief from the stay). The Bankruptcy Court thus did not err in finding a willful violation.

Nor did the court err in finding the Bank liable for the entire sum of the debtors' attorney's fees incurred in reacquiring the vehicle. The Court's award of fees was clearly authorized by § 362(k)(1). And contrary to the Bank's suggestion, the Court did not "completely ignore" the role of the debtors' attorney in awarding such fees. The Judge specifically recognized there was "some level of intransigence on each side," Doc. 2, Exh. 17 at 12, but the bottom line was that the Bank's

---

[5] There is a limited good-faith exception provided for in § 362(k)(2), but the Bank does not contend that section applies here.

actions violated the stay and "the debtors had to go to Court to secure return of the vehicle...." *Id*. at 13.  The court finds no error in this conclusion.  Similarly, although the Judge ultimately agreed with the Bank that the debtors should pay the pre-petition storage charges, the Bank nevertheless violated the stay by refusing to release the car unless all storage charges were paid, and the debtors were forced to go to court to remedy the violation.  The court did not err in awarding the debtors their attorney's fees under such circumstances.

V.  *Conclusion*.

The judgment of the Bankruptcy Court is AFFIRMED.  IT IS SO ORDERED this  6th   Day of April, 2007, at Wichita, Ks.

s/Wesley E. Brown
Wesley E. Brown
U.S. District Judge